# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### SEPTEMBER 1997 SESSION

**FILED**

December 9, 1997

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **C.C.A. NO. 03C01-9702-CR-00057** |
| Appellee, | ) | |
| | ) | **HAMILTON COUNTY** |
| VS. | ) | |
| | ) | **HON. DOUGLAS A. MEYER,** |
| **JEFFERY SCOTT SCHAFER,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First-degree murder) |


FOR THE APPELLANT:                     FOR THE APPELLEE:


**LARRY G. RODDY**                          **JOHN KNOX WALKUP**
P.O. Box 714                          Attorney General & Reporter
Sale Creek, TN   37373

                                      **MICHAEL J. FAHEY, II**
                                      Asst. Attorney General
                                      450 James Robertson Pkwy.
                                      Nashville, TN  37243-0493

                                      **WILLIAM H. COX, III**
                                      District Attorney General

                                      **C. LELAND DAVIS**
                                      Asst. District Attorney General
                                      600 Market St., Suite 300
                                      Chattanooga, TN   37402


OPINION FILED:_____


**REVERSED AND REMANDED**


**JOHN H. PEAY,**
Judge

## O P I N I O N

The defendant was indicted for first-degree premeditated murder. After a jury trial, he was convicted of that offense and sentenced to life imprisonment. He now appeals, raising the following issues:

1. The sufficiency of the evidence;

2. Whether the trial court erred in admitting into evidence a photograph of the victim;

3. Whether the trial court erred in allowing a lay witness to testify about her opinion of the defendant and his actions;

4. Whether the trial court erred in its treatment of one of the State's witnesses, thereby causing the witness to change his testimony to the defendant's prejudice; and

5. Whether the trial court erred when it instructed the jury about parole eligibility dates.

Upon our review of the record, we reverse the judgment below and remand this cause for a new trial.

## FACTS

On the evening of August 31, 1994, the defendant and the victim, Gary Lynn Branum, were drinking beer together in a bar called Fuzzy's Place. Kellie Denise Sherrill, who was working as a bartender that night, testified that Branum had been a regular customer but that she had never seen the defendant before. She arrived at the bar at approximately 7:00 p.m.; Branum and the defendant were already there, drinking beer.

Vicki Irene Jentry was a friend of Sherrill's and also arrived at the bar at about 7:00 p.m. She had never met either man, and while she was talking to Sherrill, Branum walked over to her and Sherill introduced them. Jentry testified that Branum had then asked her if he could sit next to her, that the defendant was "getting on [his] nerves."

2

After Branum sat next to her, the defendant came and sat on the other side of her, continuing to talk to Branum. She testified that, each time she had moved, this scene would replay. She testified that the men had talked about the Vietnam war and her impression was that the defendant had served there. According to Jentry, right before the two men walked outside the bar,[1]

> they got to talking about having to kill people when [Branum] was in Vietnam and [the defendant] said something about he understood how he felt and [Branum] looked at him and told him, he said, 'You don't know what you're talking about.' He said, 'You ain't never killed nobody.' He said, 'If [sic] you didn't ever serve,' he said, 'I can tell by the way -- the look in your eyes,' he said, 'I've been through it.'
>
> And [the defendant] said, 'Not in the Army.'

When asked about Branum's demeanor during this conversation, Jentry testified that he had been "just calm, he never -- his voice never changed or anything." Following this exchange, according to Jentry, the two men rose and walked out the front door of the bar, the victim in front and the defendant following him.

Because the men left the door open and the air conditioner was on, Jentry went to close it. As she did so, she testified, she saw Branum and the defendant standing behind Branum's car. Branum was facing her and the defendant had his back to her. After closing the door, she went back to the bar and within one or two minutes heard a "pop." She and Sherrill then "screamed he shot him" and she saw the defendant walk by the window going to the side of the building. She testified that she and Sherrill had then run to the front door and saw Branum "laying there." The next time she saw the defendant, she testified, was when "[h]e come in the back door, walked around and sat at the end of the bar . . . and he looked at [Sherrill] and he said, 'Have you seen my checkbook?' " She testified that he had said nothing about hearing a gunshot and that

---

[1]Elsewhere in the record it is established that the two men walked out of the bar shortly before 11:00 p.m.

"he was just as calm as he could be." She admitted on cross-examination that she had not seen the defendant with a gun.

Sherrill also testified that she had seen the two men walk out the front door of the bar, both leaving half-empty beer bottles behind and the defendant also leaving his checkbook behind. She saw Jentry shut the door and after Jentry had returned to the bar, she testified, she "heard a pop and I looked at [Jentry] and I said, 'Oh, my God, he shot him.'" She further testified that she had "just assumed [the defendant] shot him and about the time I looked up [the defendant] walked by the side window." Like Jentry, she testified that the defendant had subsequently walked in the back door and asked her if she had seen his checkbook.

During the commotion, someone called 911 and after the defendant had reentered the bar, Sherrill received a phone call from the police department. Officer Max Edward Johnson of the Hamilton County Sheriff's Department arrived shortly thereafter. When he got there, he found the victim lying in the parking lot; he did not see anyone else outside. While he was outside, he testified, Sherrill had come to the door and told him that "[t]he guy that shot him" was still there. Johnson went into the bar, met the defendant, patted him down for weapons and put him in the patrol car. He subsequently located a shell casing underneath Branum's car and the murder weapon approximately forty feet to the right and toward the back of the building. A holster for the weapon was found on the driver's seat of Branum's car.

Officer Larry Sneed of the Hamilton County Sheriff's Department testified that he had arrived at the scene after Officer Johnson was already there. He identified the murder weapon as a "Star 388 automatic pistol" and stated that the holster found in the victim's car "appears to fit a 380." The gun was stipulated as belonging to the victim.

4

Several hours after the murder, Officer Sneed took a statement from the defendant, in which the defendant acknowledged having been talking with another man at the bar[2] and "talking about being in the service." He denied going outside with Branum to Branum's car, stating "I was inside the bar until the police came and got me." In response to Officer Sneed's question, "Where did [Branum] go?" the defendant responded "I didn't know he left." In response to the officer's question about whether he had mentioned anything about having killed someone before, the defendant stated, "That would be hard to do because I've never killed anything, you know, except a deer once, you know, and a squirrel, but . . . "

Lloyd Dorn testified that he had been driving by the bar on the night in question and saw Branum, whom he knew, and another man in the parking lot of the bar. He testified that Branum had been at the back of a car with the other man about two feet behind him. He testified that he hadn't seen anyone else in the parking lot. On cross-examination, he testified that the defendant was not the other person that he had seen. An extensive jury-out hearing was then had, during which both the prosecuting attorney and the trial judge threatened Dorn with a perjury investigation. At the State's request, the trial judge declared Dorn to be a hostile witness. The next day, the State recalled Dorn and asked him, inter alia, "you can't tell the jury with any certainty whether or not you saw this man on that parking lot or not; can you?" Dorn responded, "As today I cannot." On further cross-examination, Dorn described the man he had seen as "probably 5'5", 5'6", around 150 or 160 pounds, curly hair and stuff." Although the record does not include the height and weight of the defendant, the record does indicate that the defendant's physical description varies somewhat from this.

Oakley McKinney of the Tennessee Bureau of Investigation testified that

---

[2]The defendant told Officer Sneed that he did not know the other man's name.

he had tested the murder weapon for latent fingerprints and did not find any. James Russell Davis, II, of the TBI testified that the results of testing for gunshot residue on the defendant's hands were "inconclusive." In other words, the residue test could neither implicate nor exclude the defendant as the person who had shot the weapon.

Dr. Frank King, a forensic pathologist and medical examiner, testified that Branum had died from a single gunshot wound "that entered the left side of the head just above the left eyeball and just below the left eyebrow." He further testified that this shot had been fired "within two feet of the body" and that the injury was "100 percent fatal."

The defendant did not offer any proof.

**ANALYSIS**

The defendant contends that the evidence is insufficient to support a finding that the homicide was committed with premeditation and deliberation as required for first-degree (premeditated) murder. He argues that the evidence supports no more than a second-degree murder conviction. We agree.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this Court. Cabbage, 571 S.W.2d 832, 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the State, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

At the time this homicide was committed, first-degree premeditated murder was defined as the "intentional, premeditated and deliberate killing of another." T.C.A. § 39-13-202(a)(1) (Supp. 1994). A deliberate and premeditated killing was "one performed with a cool purpose" and "one done after the exercise of reflection and judgment." T.C.A. § 39-13-201(b)(1) & (2) (1991). Where no direct evidence of the defendant's state of mind at the time of the killing is available, "[d]eliberation and premeditation may be inferred from the circumstances where those circumstances affirmatively establish that the defendant premeditated his assault and then deliberately performed the act." State v. James Dumas, No. 02C01-9502-CR-00031, Shelby County (Tenn. Crim. App. filed Oct. 4, 1995, at Jackson). However, circumstantial evidence of a defendant's state of mind will not support a jury verdict of premeditated murder unless the proof of premeditation and deliberation is "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Id. at 613.

This Court has previously recognized the nature of proof which must be presented before a jury may properly infer either deliberation or premeditation:

7

(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, <u>planning activity</u>;

(2) facts about the defendant's prior relationship and conduct with the victim from which <u>motive</u> may be inferred; and

(3) facts about the <u>nature of the killing</u> from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

<u>State v. Gentry</u>, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993), <u>quoting</u> 2 W. LaFave and A. Scott, <u>Substantive Criminal Law</u> § 7.7 (1986) (emphasis in original). In this case, there is simply no proof in the record which indicates that the defendant planned to murder the victim. Indeed, the evidence points instead to a spontaneous act of killing. The victim was killed with his own gun, and there is no proof whatsoever that the defendant was even aware that the victim had this gun. Nor is there any proof that the defendant might have planned to murder the victim by some other method. In short, there is no evidence of "planning activity."

As to motive, the State concedes that the proof demonstrates no argument between the two men. The proof further demonstrates little to no prior relationship between the defendant and Branum: the only evidence of any prior meeting is the defendant's statement to Officer Sneed that he had "seen the guy [he] was talking to once before" and Sherrill's testimony that Branum had said "something about he met him once before." Moreover, in his statement the defendant said that he did not even know the victim's name. The State posits the theory that the defendant took silent offense when Branum indicated his disbelief that the defendant had ever killed anyone. Yet the only proof the State offers up of this is the murder itself. As succinctly put by our Supreme Court in <u>State v. West</u>, 844 S.W.2d 144, 148 (Tenn. 1992), "[w]hile the state's theory may be true, it remains only a theory, because the prosecution has no evidence to support it." There simply is no proof in the record of a prior relationship and/or the

defendant's conduct with Branum from which a motive for premeditated murder may be inferred.

The nature of the killing supports only the inference that the defendant made a spontaneous and impulsive decision to shoot the victim. The proof demonstrates that they were outside the bar and out of sight for only moments before the victim was shot. Moreover, he was shot with his own gun: and, as pointed out above, there is absolutely no proof that the defendant was aware that the victim even had this gun, much less that he would be given an opportunity to get his hands on it. The State points to the defendant's "calm demeanor and his immediate concealment of the weapon" after the shooting as "indicative of a cool, dispassionate premeditated murder." We acknowledge that "[c]almness immediately after a killing may be evidence of a cool, dispassionate, premeditated murder." West, 844 S.W.2d at 148. Under the circumstances of this case, however, we simply do not think the defendant's demeanor after the shooting establishes that he planned the murder prior to committing it. Cf. West, 844 S.W.2d at 148 ("[W]hile the defendant's behavior manifests . . . indifference to the victim and fear of detection [such] that the jury might discredit his self-defense story, [his] failure to report the shooting to the police fails to establish premeditation and deliberation in advance of the murder.")

Similarly, that the defendant apparently threw the gun to the side of the building after shooting Branum is not sufficient evidence of premeditation and/or deliberation. See State v. Mason, ___ S.W.2d ___, ___ (Tenn. Crim. App. 1997) ("While we cannot infer premeditation and deliberation from [the defendant's] concealment of the weapon after the shooting, concealment does contradict the [defendant's] theory of self-defense by illustrating fear of detection."). See also State v. West, 844 S.W.2d at 148 ("The concealment of evidence . . . may be associated with the commission of any crime

9

and the accompanying fear of punishment.") (emphasis in original).

"The law in Tennessee has long recognized that once the homicide has been established, it is presumed to be murder in the second degree. The state bears the burden of proof on the issue of premeditation and deliberation sufficient to elevate the offense to first-degree murder." State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992) (citation omitted). In this case, the State has simply failed to meet this burden and the presumption of second-degree murder is therefore unrebutted. Accordingly, were it not for our remand of this case due to the reversible trial error set forth below, we would reduce the defendant's conviction to second-degree murder.

In his second issue, the defendant contends that the trial court erred when it admitted into evidence a photograph of the victim showing the gunshot wound. He argues that defense counsel offered to stipulate to the only fact which the photograph was offered to prove: that the shot had been fired at very close range, thereby causing powder burns to the victim's face. Moreover, he points out, there was expert testimony about the "stippling" and the nearness of the range from which the shot was fired. Accordingly, the photograph became needlessly cumulative and served merely to inflame the jury in violation of Tennessee Rule of Evidence 403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.")

In response, the State argues that the photograph was properly admitted as illustrative of the expert witness's testimony. See State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994). It also contends that defense counsel's stipulation is only one factor that the trial court must weigh in determining whether the probative value of the

photograph outweighs the danger of unfair prejudice, citing State v. Norris, 874 S.W.2d 590, 597 (Tenn. Crim. App. 1993).

This Court will not overturn a trial court's decision to admit a photograph absent a clear showing of abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). No such showing has been made here. With defense counsel participating, the photograph was selected from several as being the least gruesome.[3] The trial court determined that the probative value of the photograph outweighed "any prejudice" and that, in spite of defense counsel's offer to stipulate (to which the prosecution did not agree), "the picture is worth a thousand words." We see no abuse of discretion in the trial court's ruling, and this issue is therefore without merit.

The defendant also complains that the trial court erred when it permitted Sherrill to testify that, in her personal opinion, he was "weird" and that she had "assumed" and "suspected" that he had shot Branum. He argues that her description of him as "weird" amounted to character evidence and that "If the jury accredited [her] testimony then it could have been a substitute for motive." The State responds that, following her labeling of the defendant as "weird," Sherrill testified about specific instances of his behavior which had led her to that conclusion.[4] Thus, according to the State, "Sherrill was not testifying about possible motives, she was merely giving a simple description of [the defendant's] behavior." The State also argues that Sherrill's stated suspicion helped the jury to understand why she had told the police dispatcher (who had called in response to the 911 call) that the shooter was still at the bar.

---

[3]The choice was made following defense counsel's objection and the trial court's ruling. Accordingly, counsel's participation in choosing the photograph did not waive the defendant's right to raise this issue on appeal.

[4]In response to the State's question as to what she meant by "weird," Sherrill explained that she had noticed that whenever the defendant spoke to Branum, he would look up rather than at him. She also said that the defendant had "kept bugging" Branum.

At the time of this trial in 1995, our rules of evidence provided that a lay witness could testify "in the form of opinions or inferences" only where the opinions and inferences "(1) . . . do not require a special knowledge, skill, experience, or training; (2) The witness cannot readily and with equal accuracy and adequacy communicate what the witness has perceived to the trier of fact without testifying in terms of opinions or inferences; and (3) The opinions or inferences will not mislead the trier of fact to the prejudice of the objecting party." Tenn. R. Evid. 701(a) (1995). Our standard of review in determining whether the trial court erred in allowing the testimony at issue is abuse of discretion. See State v. Caughron, 855 S.W.2d 526, 540 (Tenn. 1993) ("It is well-settled that the propriety, scope, manner and control of the examination of witnesses is a matter within the discretion of the trial judge, subject to appellate review for abuse of discretion.")

In this case, we think the court abused its discretion in allowing Sherrill to testify that the defendant was "weird" and that she had suspected him of shooting Branum. Her testimony should have been limited to describing her observations of the defendant's behavior. The jury could then have drawn appropriate inferences from these observations. Instead, Sherrill was allowed to testify that she had found the defendant "weird" with very little factual basis on which to support this opinion. Worse, her assumption that the defendant had shot Branum -- voiced before she even saw Branum on the ground -- was based on no specific event or conduct or words about which she testified, other than having heard a "pop." We find that this testimony was misleading to the defendant's prejudice. Thus, this testimony did not satisfy the requirements of the applicable rule of evidence and should have been excluded.

However, that portion of Sherrill's testimony at issue was useful to the State only for proof of premeditation and/or deliberation, insofar as it may have assisted the jury in determining why the defendant killed Branum (because he was "weird") or in

12

concluding that Sherrill suspected him because she had observed some behavior on his part that indicated his intent or plan to kill Branum: but which observation was otherwise not elicited during her testimony. In other words, the jury may have inferred from Sherrill's inferences that the defendant had in fact demonstrated some premeditation or deliberation, and that Sherrill simply did not testify about all of the specifics underlying her opinions. Yet, even with this erroneously admitted testimony, we have found the evidence to be insufficient to support a verdict of premeditated first-degree murder. Thus, it is unnecessary for this Court to determine whether its admission constituted reversible error. We caution the trial court, however, that this opinion testimony would be irrelevant in the defendant's new trial.

The defendant also contends that the trial court committed reversible error in its treatment of Lloyd Dorn. We agree. On initial cross-examination, defense counsel asked Dorn, "You can't identify the other person that was there, can you tell me whether or not it was him?" apparently pointing to the defendant. Dorn responded, "No, it wasn't that guy." On redirect, the prosecuting attorney asked, "You're saying today, you see this man here [again, apparently pointing to the defendant] and you don't recognize him as the person you saw in the parking lot?" to which Dorn responded, "No, I do not recognize him." The State then asked, "Is it your testimony today that you can describe what that other person looked like or you just don't know?" and Dorn said, "The other person was shorter than this guy." The prosecutor then asked that Dorn be declared a hostile witness because he "interviewed this man on Sunday and he told me very specifically he had no idea."

The jury was removed and the State proceeded to voir dire the witness. Dorn indicated that the man he had seen on the parking was not only shorter than the defendant, but his hair was different and he was stockier than the defendant. The

prosecuting attorney then reviewed with Dorn the statement that Dorn had given to Officer Sneed during the investigation in which no mention was made of the other person's build. Dorn testified that "he didn't ask me, you know, what the person looked like." The prosecutor then questioned Dorn about a conversation between Dorn, the attorney and Officer Sneed on the Sunday preceding the trial:

> Q: And do you remember us asking you about him?
>
> A: You just asked me, you know, who I seen.
>
> Q: Yeah, I asked you a lot of things; didn't I?
>
> A: And you asked me if I knew the other person and I said no.
>
> Q: And I asked you what he looked like?
>
> A: Now, I don't remember you asking me that.
>
> Q: You don't remember, you don't remember me asking you what he looked like and you said, "I don't know, I couldn't identify him"?
>
> A: No, I couldn't identify him because I don't -- I never have seen the person in my life.
>
> Q: . . . Did you or did you not tell me on Sunday that you couldn't identify the man who was on that parking lot if he was standing right there in front of you, weren't those your words?
>
> A: No, I don't think so.

At this point, the prosecutor admonished Dorn, "I want you to think about that answer." Defense counsel objected, and the trial judge stated to Dorn, "No, I've got to caution Mr. Dorn that you know that you are under oath? . . . Perjury is lying under oath . . . . And it carries one to six years in the penitentiary . . . . So just remember that when you're answering questions."

The trial court did not err in instructing the witness about the significance of his oath. However, at this point in the proceedings, defense counsel stated, "Well, Judge, I don't think there's any reason to think that this witness is lying" and the judge responded, "Well, I think there's every reason to believe that." After some further

14

discussion with defense counsel, the trial court declared Dorn to be a hostile witness. The prosecutor subsequently stated, "I have a good faith basis to believe that this man is committing perjury and I'm on the verge of recommending that we go to the grand jury with it and I'm going to give you an opportunity to explain your answer clearly at 12 o'clock -- " Defense counsel then asked to state an objection to which the court responded, "No, let the Attorney General continue." Defense counsel attempted again, and the judge stated, "Mr. Roddy, sit down."

The prosecutor then continued its voir dire of Dorn, stating that he had asked Dorn on Sunday, "could you give me any description of the person who was on the lot that night?" Dorn responded, "I understand you asked me did I know the person that was there and I said no." After further fruitless questioning, the State called Officer Sneed to the stand to discuss Sunday's discussion with Dorn. Officer Sneed testified that the prosecuting attorney had "asked [Dorn] about the other person and Mr. Dorn did make the statement that he didn't believe he could identify that man or recognize that man if he was on the parking lot with us at that time." On cross-examination defense counsel asked Officer Sneed if he had ever asked Dorn to describe the person he had seen, and Officer Sneed responded, "No, sir." He also admitted that he had not shown Dorn any photographs. Dorn was then recalled to the witness stand and he reiterated in response to further questioning by the State that he had never seen the defendant "until this morning." The judge then questioned Dorn, asking him if he had spoken with any of the defendant's friends or family, or if he had discussed the matter with anyone other than defense counsel, to which Dorn replied no.

At this point in the proceedings, it is obvious that the State had been unpleasantly surprised by Dorn's testimony. However, stating that you could not identify or recognize someone if you saw them again is different from, but not inconsistent with,

15

later stating that a particular person is not the person you had seen earlier. During its voir dire of both Dorn and Office Sneed, the State did not establish that Dorn had earlier refused to give a description of the man he had seen. Nor did it establish that it had provided Dorn with an opportunity to identify or recognize the defendant in which Dorn responded differently than he did at trial. Thus, the State failed to establish on the record that there was a good faith basis to suspect Dorn of perjury. Indeed, after the prosecuting attorney finished examining Dorn he stated to the court, "I think the man's offered perjured testimony, but I don't think it's strong enough to move for an indictment on it." The court responded, "No, I don't think [so] either." However, the judge then stated, in Dorn's presence, "I think that Mr. Sneed or members of the sheriff's department should investigate this case further to see if [Dorn] has had contact with anyone else and if he has then he should be indicted for perjury."

When the court reiterated its declaration of Dorn as a hostile witness, defense counsel objected. The judge responded, still in Dorn's presence, "I believe that Mr. Dorn is lying under oath. I don't think there's sufficient proof at this time, but I think he thinks that he can come into court like other witnesses do at times, unfortunately we do have too much perjury in court and I think that this man is committing perjury." In its continuing colloquy with counsel, the court went on:

> I think the man is committing perjury.
> . . .
> And he may suffer the consequences if --
> . . .
> -- the county investigates and can prove it because to me murder is extremely serious and is something that we should definitely try, but to me the second thing is perjury. Anything that corrupts the judicial process is a very serious offense and all efforts should be expended to prosecute anyone who commits perjury so they should investigate.
> . . .
> I'm a pretty good lie detector.
> . . .
> I think the man is lying under oath. It's that simple.
> . . .
> But as I say if he's not then nothing will happen, if he is hopefully they will be able to prosecute him for it because I do not think that -- treat that very

16

lightly that anyone would come into court and lie under oath.

Defense counsel then repeated its objection to Dorn being declared a hostile witness.

The prosecutor then spoke up, and the trial judge stated to him, "But I think Mr. Davis you'd be pretty foolish to question him much further because I think he's already testified and I think the best thing you could do is move on and hope that the jury believes the other witnesses . . . . Because you don't want to get off on trying this man . . . . Because see, you know, that's always a good ploy is to try somebody else so I think it would be best if we continue trying Mr. Schafer." The jury was subsequently returned to the courtroom and the State initially passed on further questions. Defense counsel then asked Dorn, "Is that the man that was out there when you drove by?" and Dorn responded, "To my best recollection, no." The State followed with a short redirect.

The next day, the State again called Dorn to the stand outside the presence of the jury and established that he knew defense counsel and defense counsel's father independently of the case. Following this, Dorn asked to make a statement and the court said,

> Okay. See, let me advise you of this, Mr. Dorn, you have every right to be represented by a lawyer because this Court believes that you lied under oath yesterday, just flat lied and you thought that you could get away with it and you may be able to get away with it because the State may not be able to prove that you lied under oath, but it looks like they've done a pretty good job in one evening of digging up some information about you[5] so if you want to say anything I'll let you say anything you want to say, but I want to caution you that anything you say could be used against you and everything you say is being taken down.

Dorn then explained how he had talked with his wife the night before and that he had "worried and worried and worried and run through my mind about seeing the person

---

[5]The only "information" reflected in the record is the witness' prior relationship with defense counsel and defense counsel's father. We are aware of nothing which establishes that such a relationship is probative of perjury.

17

there." He explained that he and his wife had driven by Fuzzy's again the night before and tested his ability to recognize and remember the vehicles he saw as they drove by. He then said, "I could have made a mistake. I am only human, Judge." The following then took place:

> THE COURT: Well, no, the Court just obviously thinks what you intended to do was assist Mr. Roddy. I don't accuse Mr. Roddy of doing anything improper, but I accuse you of wanting to help Mr. Roddy by saying that this man definitely wasn't the person you saw there and you never indicated that to Mr. Davis or to Detective Sneed ahead of time.
>
> THE WITNESS: Well, I was never actually asked about that.
>
> THE COURT: No, I think you're trying to backpedal now or something, but anyhow, you've had your say on that.
> . . .
> THE COURT: So you could have been wrong about that not possibly being him?
>
> THE WITNESS: Yes.

The jury was then returned to the courtroom and the prosecutor asked, inter alia, "You can't tell us, you can't tell the jury with any certainty whether or not you saw this man on that parking lot or not; can you?" Dorn responded, "As today I cannot." In response to further questioning, he testified, "I'm only human and a person can be wrong. . . . I was wrong yesterday, yes."

Clearly, the multiple threats of prosecution by the State and the court, and the court's repeated declarations that it believed Dorn to be guilty of perjury in spite of the fact that Dorn was not on trial for same, had an effect on Dorn's testimony. Just as clearly, the change in testimony was to the defendant's detriment. While we agree that a trial court may properly advise a witness of the significance of lying under oath, the court in this case went far beyond an appropriate warning. In this case, the court went so far in threatening and intimidating the witness, with resulting prejudice to the defendant, that the defendant's right to a fair trial was compromised and the outcome of the trial brought into question. Under the circumstances of this case, the trial court's

18

comments to the witness and the prosecution constituted reversible error. <u>See</u> T.R.A.P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.") Accordingly, we reverse the judgment below and remand this matter for a new trial.[6]

Finally, the defendant contends that the trial court erred when it instructed the jury on parole eligibility dates. However, he candidly concedes that he "believes the [trial court] correctly charged the jury pursuant to [T.C.A. § 40-35-201] but respectfully submits that the instruction denied him due process of law" under the fourteenth amendment to the United States Constitution. Because he cites us to no authority in support of this proposition, this issue is waived. Ct. Crim. App. R. 10(b).

The evidence being insufficient to support a conviction for first-degree premeditated murder and the court below having committed reversible error, we reverse the defendant's conviction for first-degree premeditated murder and remand this matter for a new trial on second-degree murder and any appropriate lesser offenses.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
DAVID G. HAYES, Judge

---

[6]Given our ruling on the sufficiency of the evidence, the defendant's new trial is limited to second-degree murder and any appropriate lesser offenses.

_____
WILLIAM M. BARKER, Judge