# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 26, 2011 Session

## STATE OF TENNESSEE v. ANDREW MANN

**Direct Appeal from the Criminal Court for Knox County**
**No. 87826-A      Richard R. Baumgartner, Judge**

---

**No. E2010-00601-CCA-R3-CD - Filed January 23, 2012**

---

The defendant, Andrew Bryan Mann, was convicted of two counts of first degree premeditated murder after he shot and killed his girlfriend's father and stepmother. He was sentenced to two consecutive life terms in the Department of Correction. The primary issue at the defendant's trial was whether or not the defendant's killing of the victims was premeditated. On appeal, the defendant claims that the trial court erred by: (1) denying his motion to suppress; (2) refusing to allow his expert witnesses to testify concerning the defendant's ability to premeditate; (3) admitting photographs of the crime scene; (4) excluding a report made in 2003 by his girlfriend to the Department of Child Services claiming that she had been abused by one of the victims, and (5) imposing consecutive life sentences on the grounds that he was a dangerous offender. After carefully reviewing the record and the arguments of the parties, we reject each of these claims and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, J., joined. DAVID H. WELLES, SP. J., not participating.

Mark E. Stephens, District Public Defender, and John Halstead and Gianna Maio, Assistant Public Defenders, for the appellant, Andrew Mann.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; and Leslie Nassios and Sean McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

There is presently no dispute that on June 29, 2007, the twenty-one-year-old defendant

shot and killed his girlfriend's father, Terrance McGhee, and his girlfriend's stepmother, Alisa McGhee. On October 2, 2007, the defendant was indicted on two counts of first degree premeditated murder in violation of Tennessee Code Annotated section 39-13-202. That same indictment charged one of the defendant's friends, Christopher Kirkland, with two counts of being an accessory after the fact to the murders, in violation of Tennessee Code Annotated section 39-11-411. The defendant's girlfriend, sixteen-year-old Amanda McGhee, was also arrested in connection with the murders. She was eventually transferred to criminal court, indicted as an adult on two counts of first degree murder, and ultimately pled guilty to two counts of second degree murder. This appeal, however, concerns solely the defendant, who was tried separately on both charges in the Criminal Court for Knox County on December 2-5, 2008. Certain pretrial matters were addressed by the trial court on December 1, 2008.

Prior to trial, the defendant filed a motion to suppress two statements and a gesture made to police on July 1, 2007, on grounds that those statements were given in violation of *Miranda v. Arizona* and were coerced in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and their state law counterparts. An evidentiary hearing was held by the trial court concerning the matter on November 24-25, 2008, at which two of the arresting officers, one of the investigating detectives, and the defendant each took the stand and testified to their version of the events surrounding the defendant's arrest and his subsequent interrogation. Following this hearing, the trial court denied the defendant's motion to suppress from the bench. The trial court issued a written order to similar effect on December 12, 2008. The trial court found that the evidence presented – including an audio tape of the defendant's first full confession and a videotape of the defendant's second full confession, as well as the testimony of the witnesses – established that the defendant was fully advised of his rights prior to giving his confessions. The trial court also found that the defendant never made any sort of request for counsel, whether equivocal or unequivocal, during his questioning. The trial court concluded that the evidence fully established that the defendant knowingly, intelligently, and voluntarily waived his various constitutional rights before he spoke with the police on the day in question.

At the defendant's trial, the State presented the testimony of members of the victims' family who had found the bodies of Terrance and Alisa McGhee, as well as the testimony of various arresting officers, crime scene investigators, and two detectives who had questioned the defendant on the day of his arrest. The State also presented the testimony of R.D., a juvenile friend of Amanda McGhee's who testified that: (1) the defendant and Amanda McGhee had been dating; (2) Amanda McGhee had recently told her that she was pregnant; (3) a few days prior to the killings, Amanda had given her a Crown Royal bag with instructions to give it to the defendant; (4) when she delivered the bag to the defendant, she inquired as to the bag's contents, and the defendant pulled a gun out of the bag; (5) when she

asked the defendant if he intended to kill Amanda's parents, he just smiled; and (6) when she asked him why he would do such a thing, the defendant replied that he did not want to go to jail – which she understood to mean that the defendant was afraid that Amanda's parents would press a statutory rape charge against him because he had gotten Amanda pregnant and was "way over" the legal age. On cross-examination, R.D. stated that Amanda McGhee was often untruthful and had faked pregnancies in the past. R.D. also asserted that she never called the police prior to the killings because after all these events transpired, Amanda told her that she was not going to go through with the plan to kill her parents.

The defendant's friend, Christopher Kirkland, also testified on behalf of the State. Mr. Kirkland testified that a few days before the murders, he was working with the defendant on a house that the two planned on moving into at some subsequent date. On that occasion, the defendant expressed his anger at Amanda's parents for trying to keep the two of them apart because of their age and stated that he wanted to shoot and kill them. Mr. Kirkland testified that he replied that if he was to ever kill anyone, he would do it by shooting them in the head. The defendant requested Mr. Kirkland's help in killing the victims, and Mr. Kirkland agreed. Mr. Kirkland testified that on the morning of the shootings, he received a telephone call from the defendant, who stated that he was at the McGhees' house and that Mr. McGhee was asleep in the bed facing away from the defendant. The defendant wanted to know if he should shoot Mr. McGhee in the back of the head because he could not shoot him in the front of the head. Mr. Kirkland testified that he replied, "I don't know," and hung up, only to receive a call later in the day from the defendant, requesting that he meet with him. When he arrived at the meeting place, the defendant and Amanda McGhee requested that he come to the McGhees' house because they had shot Mr. McGhee. Mr. Kirkland complied and saw Mr. McGhee's body lying on the bed, at which point he "freaked out" and left. Before leaving, the couple informed him that they intended to kill Alisa McGhee when she returned home from work that day because otherwise she would be a witness to the murders. According to Mr. Kirkland, although Amanda McGhee was not upset over her father being killed, killing Alisa McGhee was the defendant's idea and Amanda McGhee did not want to do it. Mr. Kirkland testified that he met with the couple again later that night at a restaurant, where they acted as if nothing had happened. Over the next several hours, the defendant tried to talk Mr. Kirkland into pouring bleach over the bodies to reduce any stench that might otherwise develop and suggested a variety of plans for disposing of the bodies. Mr. Kirkland testified that the defendant appeared to be "calling the shots."

On cross-examination, Mr. Kirkland testified that the defendant told him that Amanda McGhee was being physically abused by her father and that the defendant was worried for her safety. Mr. Kirkland also testified that the defendant had told him that Mr. McGhee had once pulled a gun on him when he had brought Mr. McGhee's daughter back to the McGhees' residence one day, and that he had taken away the defendant's identification.

Other witnesses for the State testified as to the location of the victim's bodies when they were found – Mr. McGhee's body being found on a bed with a bullet wound to his head and Ms. McGhee's body being found in the hallway with bullet wounds to her back and arm. Ms. McGhee's body was fully dressed, but there was a towel partially covering her. The State's witnesses further testified that the rug underneath Ms. McGhee's body had a light-colored stain that smelled like and appeared to be bleach, and a bottle of bleach was found in the living room.

The State's forensic pathologist, Dr. Darinka Mileusnic-Polchan, opined that the cause of Ms. Alisa McGhee's death was multiple gunshot wounds, leading to a lack of oxygen circulating to her brain. She further opined that the shooter had stood behind Ms. McGhee and that she may have been conscious for three or four minutes before succumbing to her wounds. The medical examiner opined that Mr. McGhee had died of a single gunshot wound to the head, which caused traumatic destruction of his brain tissue as well as swelling and bleeding around his brain. She further opined that Mr. McGhee had been shot from behind and that it was possible he may have been conscious and capable of feeling pain for an hour or two after receiving his injury.

After the State rested, the defense made a motion for acquittal, which was denied. The defense then presented its case in chief. The defense position was that, although the defendant verbally agreed with Amanda McGhee's repeated requests to kill her parents, he never actually intended to harm them. In this regard, the defendant proffered the testimony of two experts, Dr. Malcolm Spica, a neuro-psychologist, and Dr. James Murray, a forensic pathologist, who had examined the defendant with respect to a possible insanity defense. The defense intended to use their reports and testimony both to establish a "diminished capacity" defense and to help establish the defendant's mental state with respect to a "heat of passion" defense. The State objected on the grounds that neither expert could testify with a reasonable degree of scientific or medical certainty that the defendant lacked the capacity to premeditate a homicide. The defense urged that the experts' findings concerning the defendant's various mental problems – which included his having experienced hypoxia at a young age, major depression, and various issues relating to his intelligence, social function, and attachment disorder – were relevant to the defendant's mental state at the time of his offense. The trial court took the matter under advisement but made no definitive ruling at that time.

The defendant then took the stand in his own defense and testified concerning his background. He generally testified that Amanda McGhee had repeatedly told him that she was being physically abused by her father. He testified that she begged him to kill her father to protect her from the abuse. He testified that, on one particular day, she told him if he did not help her escape she was going to kill herself. He testified that he picked her up from her

-4-

house on that day. He testified that the couple stayed away for a while, but he eventually brought her home when Ms. McGhee threatened him over the phone. He testified that when he arrived back at their house on this occasion, Mr. McGhee blocked his car in the driveway with his own vehicle, pulled a gun on him, and threatened to kill him right "then and there" before confiscating his identification and writing down his personal information.

The defendant testified that following this incident, Amanda McGhee told him that she was pregnant with his child. He testified that she told him she was afraid for her safety and for the safety of their unborn child because her father was hitting her "every single day." He testified that she begged him not to call the police as this would only make the situation worse. He testified that Amanda McGhee told him that once her father found out she was pregnant, he would put the defendant in jail for statutory rape and force her to have an abortion. He testified that she devised a plan to kill her parents, and he agreed to go along with it because he did not want to lose Amanda. He testified that, on the day of the killings, she started calling him every thirty seconds and telling him things like "[b]aby, this has to be done." He testified that he did not want to kill the victims and went to Amanda's house and told her so that day. He testified that after this conversation, he went to Mr. McGhee's bedroom carrying a gun that had been delivered to him previously, and called Mr. Kirkland, asking him how to commit the killings. He testified that Mr. Kirkland told him to shoot Mr. McGhee in the back of the head. He testified that he did so and afterward Amanda McGhee came out of her bedroom and told him "[b]aby, we're one step down, one step to go."

He testified that he left and returned to the house later that day. After arriving at the house, Amanda McGhee called her stepmother, asked when she would be home, and told her that she loved her. The defendant testified that he again told Amanda McGhee that he "can't do this." He testified that Amanda replied, "it's too late, you have to do it." The two argued about whether to kill Alisa McGhee until Alisa came through the front door. The defendant testified that he told Alisa McGhee to sit down for a minute because they "need[ed] to talk." He testified that he hoped Alisa McGhee would pull out a phone and call the police, but instead she made a quick joke and ran toward the kitchen. He testified that he shot her twice, and afterward Amanda McGhee came out of her room laughing and stated, "[b]aby, now we're together forever."

Following this testimony, the trial court held a jury-out hearing to review the testimony of Dr. Spica and Dr. Murray, who described the various research and tests they had done concerning the defendant and opinions they held regarding the defendant's various mental problems. Dr. Spica testified that the defendant's IQ scores ranged around low average. Dr. Spica stated a belief that the defendant suffered from an unspecified mental disorder but could not state with any certainty what that disorder was or whether it would interfere with the defendant's ability to act intentionally. Dr. Spica testified that he would

need to defer to Dr. Murray's opinion in that regard. Dr. Murray took the stand and opined that the defendant was substance dependant, chronically depressed, suffered from disorganized and distorted thoughts, and had a borderline functional IQ of 77. He also opined that the defendant did not learn well from past experiences. On cross-examination, Dr. Murray stated that he found no evidence to support the assertion that the defendant was incapable of forming an intent to kill, premeditated or otherwise, within a reasonable degree of scientific certainty. At the conclusion of this testimony, the court considered the experts' reports and testimony. The trial court found that there was no proof in the record that the defendant had suffered any kind of organic brain damage. Furthermore, the trial court found that neither doctor could testify that, even considering all of the numerous factors they took into account, the defendant was incapable of forming an intentional or premeditated act. The trial court excluded their testimony accordingly.

After making this ruling, the trial court charged the jury and both sides made closing arguments. The jury retired at 1:18 p.m. on December 5, 2008, and returned with a verdict at 2:33 p.m. that same day. The defendant was found guilty on both counts. On January 15, 2009, the trial court sentenced the defendant to two consecutive life sentences. The defendant filed a timely motion for new trial, which was denied by the trial court on February 4, 2010. On March 4, 2010, the defendant filed a timely notice of appeal. After granting various extensions of time to the parties to complete their briefing, this matter came to be heard before a panel of this court on April 26, 2010. Our opinion follows.

**ANALYSIS**

The defendant raises five challenges to the judgments below. First, the defendant claims that the trial court erred by denying his motion to suppress two pretrial statements and a pretrial gesture he made to police. Second, the defendant claims that the trial court erred by excluding the testimony of his proffered experts, Dr. Daniel Spica and Dr. James Murray. Third, the defendant claims that the trial court erred by admitting three crime scene photographs depicting the bodies of the victims. Fourth, the defendant claims that the trial court erred by excluding evidence of a report made in 2003 by Amanda McGhee to the Department of Children's Services alleging that her father had physically and sexually abused her. Finally, the defendant claims that the trial court erred by sentencing him to consecutive life terms. We address each claim in turn.

**I.**

The defendant urges that the trial court erred by denying his motion to suppress two prior statements and a prior gesture made to police as taken in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and his right to counsel under the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution and his analogous rights under the state constitution. Under the standard established in *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996), "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." The party prevailing in the trial court is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). However, a reviewing court will review "de novo the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005). This court has often stated that whether a defendant "did or did not make an equivocal or unequivocal request for an attorney is a question of fact." *State v. Farmer*, 927 S.W.2d 582, 594 (Tenn. Crim. App. 1996). This reasoned principle of law is grounded in the fact that trial courts are in the best position to judge evidentiary matters relevant to whether or not an assertion of the right to counsel has been made, and whether any putative assertion was equivocal or unequivocal. Such a determination often includes an assessment of the credibility of witnesses; the weight that should be accorded to various sorts of evidence; resolving potential conflicts between audio recordings, video recordings, written transcripts, and the testimony of live witnesses; and making other such quintessentially factual determinations. However, as our supreme court has observed, in situations in which there is no factual dispute in the trial court over whether certain statements were made and/or heard, what events transpired, the context in which those statements or events occurred, *etc.*, in practice, this court has recognized the issue as one of law and "has not afforded deference to the rulings of trial courts." *State v. Turner*, 305 S.W.3d 508, 514 (Tenn. 2010).

Both the federal and state constitutions protect a defendant against compelled self-incrimination. *See, e.g.*, *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005). In *Miranda v. Arizona*, the United States Supreme Court adopted broad procedural safeguards designed to protect an individual's right against self-incrimination and held that the exclusionary rule requires the suppression of statements made by a defendant during custodial interrogation unless the police have first advised the defendant "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. If a suspect unequivocally asserts his right to counsel, police questioning must cease unless the suspect initiates further discussion. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

In this case, the defendant challenges the trial court's decision not to suppress police testimony concerning a gesture he made immediately after being handcuffed, an audio tape recording of his confession to the killings, and a subsequent videotaped statement in which he again confessed to the killings. He argues that the trial court should have suppressed the

gesture because it was made prior to the issuance of *Miranda* warnings, the second audiotape statement because it was made after either the defendant made an assertion to his right to counsel (either unequivocally or equivocally), and the third videotape statement because it was the "fruit of the poisonous tree" of the earlier unconstitutional interrogations. For the reasons that follow, we disagree with these arguments and affirm the judgments of the trial court.

**A.**

The defendant was arrested on July 1, 2007, at an abandoned house where he was staying on Luttrell Street. He was located there by undercover operatives who spotted him while searching the general area indicated by information provided by the defendant's cell phone company. According to testimony of the arresting officer, Officer Henderson, when he entered the house with three other officers and took the defendant into custody, the defendant asked, "[w]hat have I done?" Officer Henderson testified that he replied "[y]ou know exactly what you've done," at which point the defendant "put his head down and shook his head yes." The defendant claims that the officer's testimony concerning this gesture should be suppressed because the defendant had not yet been advised of his *Miranda* rights.

However, the defendant's ambiguously vague but potentially incriminating gesture occurred before the officers' duty to inform the defendant of his *Miranda* rights had been triggered. A suspect must be informed of his *Miranda* rights before the suspect may be subjected to police-initiated custodial interrogation. *Miranda*, 384 U.S. at 444. The record might support a conclusion that the defendant was in custody when the officer responded to the defendant's question and the defendant made the gesture at issue. Officer Henderson testified on direct examination that the defendant was "in[] custody then," although, on cross-examination, he indicted that he cuffed the defendant "while he was nodding his head yes," which would seem to indicate that the police officer's response to the defendant's question was made before the defendant was placed into handcuffs. In either case, a suspect is considered to be in custody for *Miranda* purposes if he "has been taken into custody or if [he has been] deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The presence of four police officers approaching the suspect for purposes of serving a *capias* could support a conclusion that the defendant was significantly deprived of his freedom, even if the officers had not yet informed him that he was under arrest or placed him in handcuffs cuffs prior to the defendant posing his question to the officer, the officer's response, and the defendant's making of his gesture.

We do not reach this issue, however, because we do not believe that the officer's comment – whether made prior to or during the defendant's arrest – constituted interrogation by the police. While the officer's comment was a declarative sentence rather than a

question, this fact, standing alone, does not dispose of the constitutional inquiry. "Interrogation 'refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Sawyer*, 156 S.W.3d 531, 534 (Tenn. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). A declarative sentence could qualify as interrogation under this standard. However, the officer's comment was not one that the officer should have known was reasonably likely to elicit an incriminating response from the defendant. The defendant, not the officer, initiated the verbal exchange by asking, "[w]hat have I done?" There was little, if any, reason for the officer to suspect that his flippant reply "[y]ou know exactly what you've done" would suddenly elicit an incriminating response from the defendant. Upon hearing such a reply to this sort of question posed to an officer while being arrested, a reasonable person, whether guilty or innocent, would either make no response at all or would continue to inquire as to the nature of the charges against him.

Moreover, a defendant's verbal demand to know the reason why he is being placed under arrest and an officer's ensuing verbal refusal to provide those grounds (however worded) until the suspect has been physically secured to the extent necessary to safely provide his *Miranda* rights are words and actions that are "normally attendant to arrest and custody" and, therefore, not deemed to constitute police interrogation. *See Innis*, 446 U.S. at 301. Officers do not violate the Constitution simply because a defendant blurts out a potentially incriminating statement before the approaching officers have had the opportunity to safely secure the defendant's person at the scene of his arrest in order that they may provide his *Miranda* warnings without exposing themselves or others to undue risk or danger.

Finally, our supreme court has made clear that an officer's mere act of reading a warrant to a defendant is not the functional equivalent of interrogation. *Sawyer*, 156 S.W.3d at 534-35. On the particular facts of this case, although the defendant was a murder suspect, he was being placed under arrest on an outstanding warrant for a failure to appear in court that was unrelated to the killings at issue. The record establishes that the defendant was aware of this outstanding warrant at the time of his arrest. Thus, the officer's statement to the effect that the defendant knew why he was being arrested was effectively the functional equivalent of simply repeating the basic content of that warrant to the defendant – an act that does not constitute the functional equivalent of interrogation. For this same reason, the defendant's act of nodding his head in response to the officer's statement was also of only dubious incriminating value with respect to the crimes at issue in this case – a factor that would play a critical role in any inquiry made by this court concerning whether or not any violation of the defendant's *Miranda* rights would constitute harmless error. *See State v. Koffman*, 207 S.W.3d 309, 320 (Tenn. Crim. App. 2006) (upholding conviction

notwithstanding violation of defendant's *Miranda* rights because the court was able to "conclude beyond a reasonable doubt that the erroneous admission of Defendant's statement did not affect the verdict"). However, in light of our conclusion that the defendant was not subjected to interrogation or its functional equivalent prior to making the gesture at issue, we do not reach this latter issue. The defendant's claim is denied.

**B.**

The defendant's challenge to the admissibility of his separate audio and video tape-recorded confessions hinges on his utterance of a single barely intelligible phrase during the course of receiving what the record reflects was his fifth set of warnings concerning his right to an attorney. The phrase at issue was uttered during the defendant's first audio taped interrogation by police, which occurred at or near the site of his arrest. The trial court found that the defendant's utterance of this phrase – transcribed as "she's at home, I'm sure" – was neither an equivocal nor an unequivocal assertion of his right to counsel, and the evidence does not preponderate against this factual finding. Moreover, as the trial court correctly observed, even if the defendant's statement could be construed as an equivocal right to counsel, his silence in the face of the officers' extensive ongoing explanation of his rights, and his subsequent execution of the written waiver form, sufficiently clarified that the defendant was not invoking his right to counsel.

The record establishes that after his arrest, one of the arresting officers, Sergeant Hopkins, advised the defendant of his *Miranda* rights on four separate occasions. Sergeant Hopkins testified that he did so the first time as a matter of course immediately following the defendant's arrest, and did so three additional times as he gave the defendant three separate "consent to search" forms to sign over a brief period of following time. The defendant signed these forms and made no assertion of his right to counsel at any point during this time period. Instead, he actively sought to speak with Sergeant Hopkins – declaring, "I've done something bad," and making other potentially inculpatory statements – but Officer Hopkins discouraged him from speaking and told him to wait until the police detectives arrived.

Thereafter, Detectives Grissom and Treece arrived and began a tape-recorded interview of the defendant on the front porch of the house where he was arrested. On the tape, the detectives can be heard advising the defendant of his *Miranda* rights. As Detective Treece reached the portion explaining "[y]ou have the right to talk to a lawyer for advice before we ask you any questions and have him or her with you during the questioning," the defendant mumbled a statement that cannot be definitely discerned from the audio CD contained in the record but which has been transcribed as "she's at home, I'm sure." Following this statement, Detective Treece continued to explain the defendant's rights to him, explaining "[i]f you cannot afford to hire a lawyer, one will be appointed to represent

-10-

you before any questioning if you wish one"; "[i]f you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time"; and "[y]ou also have the right to stop answering at any time until you talk to a lawyer." The defendant made no further response to these statements. Following these cautions, Lieutenant Grissom can be heard stating, "[w]e just want to make sure you understand, if you're willing to talk to us, you always have the right to stop at any time." The defendant again expressed no desire to speak to an attorney.

The record reflects that Detective Treece continued to explain the defendant's rights to him while the defendant signed a written waiver form. That form, read aloud by the detective, states: "I have read or had this statement of my rights read to me. I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises, threats have been made against me. . . ." The defendant testified at his suppression hearing that he signed each portion of this form as it was read to him and that, at no point after his statement "[s]he's at home, I'm sure," did he make any statement that could be construed as indicating his desire to have an attorney present. The defendant agreed that the officers had advised him of his right to have an attorney present at least four additional times after he stated, "[s]he's at home, I'm sure."

The trial court found that the defendant's statement was not an equivocal or an unequivocal request for an attorney, and the evidence does not preponderate against that finding. As the trial court noted, nothing in the record reflects that the defendant indicated who his lawyer was or made any indication that he wanted to speak with her. Moreover, the defendant gave testimony at the suppression hearing indicating that he initially chose to speak with police on the day in question because he was trying to find out what information the police had. Asserting his right to counsel and forcing the police to discontinue their conversation with him would have been inconsistent with that goal. In short, the evidence supports the trial court's finding that the defendant never made an equivocal or unequivocal assertions of his right to counsel.

Even if this court were to conclude that the defendant made an equivocal assertion of his right to counsel (and thereby jettison all deference to the factual findings of the court below), the defendant would be entitled to no relief as a matter of law. The defendant asserts that as a "pre-waiver" request for counsel, his equivocal statement would fall under the test established by our supreme court in *Turner*, which held that a defendant making an equivocal assertion of the right to counsel is entitled to more favorable treatment if that equivocation occurred prior to the defendant's waiver of his *Miranda* rights on grounds that, "[w]hile the state bears the burden of proving a valid waiver of the right to counsel prior to a custodial interrogation, the burden shifts after that right has been waived." *Turner*, 305 S.W.3d at 519.

However, the testimony in the record establishes that, in the case at bar, the defendant had already received his *Miranda* rights numerous times from Sergeant Hopkins prior to beginning his interview with the detectives. The defendant had indicated his desire to waive those rights by attempting to initiate a conversation with Sergeant Hopkins, explaining that he had "done something bad" and inquiring if the police had been to the victims' house. The fact that the newly-arrived detectives, in an abundance of caution, elected to give the defendant his *Miranda* warnings for a fifth time while making an audio recording of his waiver and requiring him to fill out an additional written form does not negate the fact that this defendant had received and waived numerous prior warnings and thereby convert his "post-waiver" claim into a "pre-waiver" one. Under the Supreme Court's ruling in *Davis v. United States*, 512 U.S. 452, 458-59 (1994), which our supreme court still recognizes as the governing law concerning post-waiver requests for counsel, *see Turner*, 305 S.W.3d at 519, if a suspect does not "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," then the Constitution "does not require that the officers stop questioning the suspect." *Davis*, 512 U.S. at 459. We have little difficulty concluding that a defendant's muttering of the phrase, "[s]he's at home, I'm sure," does not suffice to meet the *Davis* standard.

Moreover, even if this court found the pre-waiver standard established by *Turner* to be applicable, the defendant would not be entitled to relief on this issue. *Turner* held that "[w]here . . . a suspect makes an equivocal request for counsel prior to waiving *Miranda* rights, the police are limited to questions intended to clarify the request until the suspect either clearly invokes his right to counsel or waives it." *Turner*, 305 S.W.3d at 519. The police followed the proper *Turner* procedure in this case. They continued to explain the defendant's rights to him and asked him no further questions. After the detectives finished explaining the defendant's rights to him, the defendant signed a written waiver form stating, *inter alia*, that: (1) he understood what his rights were; (2) he did not want a lawyer at the present time; and (3) he understood and knew what he was doing. In other words, the defendant clearly waived his right to counsel in writing. In the interim period between the allegedly equivocal assertion and the defendant's provision of a clear and unambiguous express written waiver, the police avoided any violation of their limitation on asking questions other than those intended to clarify his allegedly equivocal assertion in the most expedient manner possible – by asking no questions at all. Instead, the detectives continued to provide the defendant with an ongoing explanation of precisely what those rights were, right up until the point at which the defendant unambiguously waived them. Nothing in the Constitution, *Davis*, or *Turner* would appear to prevent the police from further informing and educating a defendant as to his constitutional rights, without engaging in any questioning, in response to an equivocal statement regarding counsel – so long as the defendant ultimately makes a knowing, intelligent, and voluntary waiver of these rights. For these reasons, the

-12-

defendant's claim that the trial court erred by failing to suppress his first audiotape confession to police is denied.

## C.

It was conceded by the defendant before the trial court, and our review of the record reflects, that the defendant never requested an attorney prior to speaking with police during his second videotaped interview at the police station. The defendant's argument that the trial court erred in failing to suppress his videotaped statement hinges entirely on his claim that it resulted from his prior unconstitutional confession. *See State v. Daley*, 273 S.W.3d 94, 110 (Tenn. 2009) (suppressing a subsequent confession where "the State . . . failed to establish . . . that the taint of the first illegal confession was so attenuated as to justify admission of the second confession"). Having held that the trial court correctly determined that the defendant's first statement was not obtained by police in an unconstitutional manner, it follows *a fortiori* that the defendant's challenge to the trial court's failure to suppress his second confession must be denied.

## II.

The defendant claims that the trial court's refusal to permit the testimony of Dr. Malcolm Spica and Dr. James Murray violated his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and their state counterparts. Expert testimony is admissible if it "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. Expert testimony, like other evidence, must be relevant in order to be admissible. *See* Tenn. R. Evid. 402. ("Evidence which is not relevant is not admissible."). Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. This court reviews a trial court's decisions concerning the admissibility of expert evidence under an abuse of discretion standard, and will reverse a decision only "'when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party.'" *State v. Parker*, 2011 Tenn. LEXIS 881 (Tenn. Sept. 23, 2011) (quoting *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)).

Before the trial court, the defendant argued that the two experts' reports and testimony were relevant to establish his diminished capacity (*i.e.,* that he was mentally incapable of premeditation) and to a jury's determination of whether or not the defendant was "sufficiently free from excitement and passion as to be capable of premeditation" as required

by Tennessee Code Annotated section 39-13-202(d). On appeal, the defendant focuses his argument exclusively on the grounds that the experts' evidence was admissible as relevant to his establishing his mental state with respect to excitement and passion on the day in question, whereas the State argues that the evidence is inadmissible because it pertains solely to the defendant's diminished mental capacity.

The State is correct in its assertion that the defendant's proffered evidence is inadmissible to establish his inability to premeditate. In *State v. Hall*, 958 S.W.2d 679, 690 (Tenn. 1997), the Tennessee Supreme Court clarified that there was no such defense as diminished mental capacity, and that mental health evidence "should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." The Court further held that "psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition." *Id.* The psychiatric testimony at issue must "show[] a lack of capacity to form the requisite culpable mental intent" in order to be admissible. *Id.* There is no question that the expert testimony and reports proffered by the defendant failed to meet this standard – both experts testified that they were unable to state within a reasonable degree of scientific certainty that the defendant was incapable of premeditation or of forming an intent to kill. *See State v. Faulkner*, 154 S.W.3d 48, 56 (Tenn. 2005) (excluding expert testimony in a first degree murder case "because [a clinical psychologist] could not testify that [the defendant] was incapable of forming [the requisite] intent as a result of a mental disease or defect").

Finding the front door to the experts' testimony thus barred, the defendant seeks to introduce that same evidence through the back door, by arguing that the testimony is relevant as pertaining not to his utter inability to premeditate his crimes, but to his particular state of mind on the day in question and specifically whether or not he was so overwhelmed with passion and emotion on that day that he was incapable of engaging in premeditation. However, it is unlikely that the supreme court intended to permit the rule established in *Hall* and *Faulkner* to be so easily circumvented. Both of those cases involved first degree murder convictions where premeditation was a hotly disputed issue, and the defendants in both *Hall* and *Faulkner* could easily have laid claim to having been overwhelmed by emotion and passion at the time they committed their crimes – the defendant in *Hall* because he had recently been broken up with and taunted by his ex-girlfriend, the victim, *see* 958 S.W.2d at 683-87, and the defendant in *Faulkner* because he had just been informed by his wife, the victims, that she was divorcing him, *see* 154 S.W.3d 53-54. The supreme court's decisions in those cases affirming the exclusion of the defendants' proffered mental health evidence without so much as a mention of the possibility that the same evidence might have been admissible as relevant to the issue of overwhelming passion constitutes a silence so

deafening that it cannot be ignored.

We also observe that, "under Tennessee law, 'the court will disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.'" *Hall*, 958 S.W.2d at 689 (quoting Tenn. R. Evid 703). The trial court below indicated that it had a number of concerns regarding the trustworthiness of the data underlying the experts' reports. These concerns included: (1) the fact that both experts indicated that the defendant suffered from substance dependence, but these conclusions were based entirely on self-reports of drug use made by the defendant after he was taken into custody and were not supported anywhere else in the testimony or evidence received by the court during the trial – a fact which the court found "very, very suspicious"; (2) Dr. Murray's own report indicated that the defendant was exaggerating his symptoms on a number of different tests, and the doctor had some serious questions concerning this issue; and (3) while Dr. Murray's report stated unequivocally that the defendant had brain damage, and Dr. Spica's report indicated the defendant had some sort of cognitive dysfunction, the record was entirely devoid of any proof that the defendant had suffered any kind of organic brain damage. While the trial court went on to state that these issues were not particularly crucial to its decision, the overall lack of trustworthiness of the experts' underlying data as found by the trial court provided an independent ground for affirming the court's exclusion of the testimony and reports of these two experts. The defendant's claim is therefore denied.

## III.

The defendant claims that the trial court erred by admitting the crime scene photographs of Terrance and Alisa McGhee's bodies as evidence during the trial on the grounds that they were highly inflammatory and not relevant to any issue of dispute during the trial. However, it has long been established in this state that the policy governing the admission of photographs in criminal cases is a liberal one. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). "The admissibility of photographs lies within the discretion of the trial court whose ruling in this respect will not be overturned on appeal except upon a clear showing of an abuse of discretion." *Id.* No such showing has been made in this case.

"The traditional rule is . . . that photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." *Id.* at 950-51. But the admissibility of any such photographs is governed by the pertinent rules of evidence. *See id.* at 951. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury." Tenn. R. Evid. 403. Graphic photographic depictions murder victims' corpses possess a certain degree of "inherent prejudice" in the sense that they may, by their very nature, inflame the passions of a jury. *See Banks*, 564 S.W. at 951.

However, before determining that this inherent prejudice is unfair and substantially outweighs the probative value of the photographs, courts should consider a number of factors, including: "the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found [are] material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions." *See id.* In addition, a court should consider the "gruesomeness" of the photographs at issue with the understanding that "[t]he more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." *Id.* Offers by the defense to stipulate to certain facts or the failure of the defense to dispute testimonial descriptions may also be relevant to a trial court's admissibility analysis, *see id.* at 951-52, but do not, standing alone, prohibit the admission of such pictures, *see, e.g., State v. Schafer*, 973 S.W.2d 269, 274 (Tenn. Crim. App. 1997) ("[D]efense counsel's stipulation is only one factor that the trial court must weigh in determining whether the probative value of the photograph outweighs the danger of unfair prejudice. . . ."); *State v. Griffis*, 964 S.W.2d 577, 595 (Tenn. Crim. App. 1997) ("A willingness to stipulate a fact does not prevent the State of Tennessee from admitting relevant, probative material into evidence.").

In this case, the trial court weighed the evidentiary value of the crime scene photographs against the danger that they might unduly inflame the passions of the jury and concluded that, on the whole, the prejudicial effect of the photographs did not outweigh their probative value. We can discern no fault with that decision. While the defendant confessed to having committed the killings, he vehemently contested the issue of his state of mind, especially with respect to premeditation. The photographs were relevant to this issue. "Photographs showing the injuries of the victim are properly admitted if the defendant admits he killed the victim but seeks to show a non-criminal homicide or that the offense was of a lesser degree than murder." *Banks*, 546 S.W.2d 949. Where "deliberation or premeditation is an element of the crime charged against this defendant, *viz.*, first degree murder," photographs may be properly introduced "to establish the degree of the homicide." *Id.*

The two most graphic photographs in dispute show (1) the body of Ms. McGhee with two bullet holes in her back, lying face down on the floor with a towel covering a portion of her body, and (2) the body of Mr. McGhee lying in his bed, with blood splatter covering a significant portion of the pillow. Although photographs of corpses in any condition are to a certain degree disturbing, as crime scene photographs go, these particular photographs are

-16-

not particularly gruesome, lurid, or likely to unduly inflame the passions of the jury.

They are, however, highly relevant to the issue of the state of mind of the shooter. They reflect that the defendant used a firearm against unarmed victims, which precedent establishes may be relevant to a jury finding of premeditation. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). In addition, the photographs reveal that a blanket and bleach had been poured over Ms. McGhee's body. Steps taken to cover up the crime may also be relevant to the defendant's state of mind, as well as to the issue of premeditation. *See State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004). The photographs are also relevant because they display the positions and locations of the bodies as they were found by the police, and support an inference that Mr. McGhee was shot while asleep in his bed and Ms. McGhee was shot while fleeing down a hallway. The photographs appear to be clear and accurate in their representations of all of the relevant facts described above.

For these reasons, we believe that the trial court properly found that the probative value of the photographs outweighed their potential to cause unfair prejudice. Although the defendant admitted to shooting the victims and the State presented testimonial evidence concerning the victim's injuries, location of the bodies, and some of the other facts revealed by the photographs, the presence of these countervailing factors is not sufficient to change the overall legal analysis in light of the other factors we have discussed above. The defendant has failed to show that the trial court abused its discretion by admitting the photographs, and his claim is denied accordingly.

## IV.

The defendant claims that the trial court erred by excluding a report made by Amanda McGhee in 2003 to the Department of Children's Services ("DCS") concerning the physical and sexual abuse she suffered at the hands of her father. As discussed previously, "[d]ecisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion" and will not be disturbed on appeal unless the trial court has abused its discretion. *Banks*, 271 S.W.3d at 116. "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* Employing this standard, we do not believe that the trial court abused its discretion by declining to admit the 2003 DCS report.

The trial court found that the records were not relevant within the meaning of Tennessee Rule of Evidence 401. As discussed above, Rule 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the

-17-

evidence." The trial court reasoned that the mere fact that Amanda McGhee had complained to DCS many years earlier of physical abuse committed by her father did not logically make it any more likely that she repeated those same claims to the defendant years later. The trial court determined that it required an unfounded "leap of faith [to conclude] that she made a complaint to A; therefore, she made . . . the same complaint to B." We do not believe that the trial court's conclusion in this regard was illogical or resulted in any injustice to the defendant.

We would add that whether or not Amanda McGhee had previously claimed to the defendant that she had been abused by her father was itself not a fact of any apparent consequence to the outcome of the trial, and therefore may not have been relevant in and of itself. The key issue to be determined at the trial was whether the defendant committed the killings in a premeditated fashion, *viz*., "after meditating sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202. Merely establishing that Amanda McGhee claimed to the defendant that she had been and was being abused by her father does not render it any more or less likely that the defendant was so consumed by passion and excitement on that particular day that he was incapable of premeditating the killings. Standing alone, it simply suggests a motive for the killings.

To establish that the defendant was so overcome by passion and excitement that he was incapable of premeditation when he killed the victims, some additional evidence would be required: evidence that might establish that the defendant had only recently learned of Amanda's McGhee's alleged abuse, had some reason to fear for her immediate safety, or any other evidence that might indicate that he was still operating under the passion and excitement of learning of the alleged abuse when he shot the victims. No such evidence was offered by the defense, and the defendant's own testimony directly contradicted any such inferences. The defendant testified that Amanda McGhee had been complaining to him that she was suffering essentially the same forms of abuse (hitting, slapping, *etc*.) at the hands of her father over an extended period of time. Such ongoing complaints, made over a period of weeks, all but foreclose the possibility that the defendant was still operating under the influence of such passion and excitement from hearing the allegations that he was rendered incapable of premeditation when he committed the killings. In short, a report of abuse made to a third party by Amanda McGhee in the year 2003, even if it helped establish that she repeated those claims to the defendant, would not render it any more or less likely that the defendant operated under such overwhelming passion and excitement on the day in question that he was incapable of meditating on his actions.

The defendant also argues that the trial judge's decision to exclude the 2003 DCS report violated his constitutional right to present a defense, in violation of *State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003). The defendant directs us to *Holmes v. South Carolina*,

547 U.S. 319, 331 (2006), and *State v. Rice* 184 S.W.3d 646, 671 (Tenn. 2006), and argues that these cases support the broad principle that a defendant has the constitutional right to present evidence implicating others in a crime. However, *Powers* held that "the Rules of Evidence are adequate to determine whether [evidence implicating others] is admissible," 101 S.W.3d at 395, and for the reasons we just explained, the trial court properly ruled that this report was inadmissible under the rules of evidence. Moreover, even if the 2003 DCS report can be properly considered as evidence implicating Amanda McGhee in the killings, the mere fact that Amanda McGhee was involved in instigating the killings (a fact about which there was no dispute at trial), standing alone, in no way exonerates the defendant or lessens his degree of culpability. *Holmes*, *Powers*, *Rice*, and other cases analyzing a defendant's right to present evidence implicating others in the commission of the crime have done so in the context of evidence that would tend to establish the defendant's innocence by the process of elimination. These cases do not stand for the proposition that a defendant has the constitutional right to present evidence implicating others in a crime simply for purposes of dragging the proverbial captain down with the sinking ship.

## V.

The defendant's final challenge is to the consecutive nature of his sentencing. "Whether sentences are to be served concurrently or consecutively is primarily within the discretion of the trial court." *State v. Dorantes*, 331 S.W.3d 370, 392 (Tenn. 2011). Trial courts may order sentences to be served consecutively if, *inter alia*, "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(4). Before imposing consecutive sentences using this factor, however, the trial court must find that proof establishes the presence of what are commonly referred to as the *Wilkerson* factors: that the consecutive terms are (1) reasonably related to the severity of the offenses and (2) necessary to protect the public. *See, e.g., State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

The parties agree, and the record reflects, that the trial court imposed consecutive sentences on the grounds that the defendant was a dangerous offender within the meaning of section 40-35-115(4). The record also reflects that the trial court addressed both of the *Wilkerson* factors before imposing consecutive sentences. Concerning the first *Wilkerson* factor – those consecutive life sentences are reasonably related to the severity of the defendant's offenses – the trial court found that the defendant "fit into category four" because "he walked into a bedroom where a man was asleep in his bed and literally shot him in the back of the head," then patiently waited several hours for the victim's wife to come home, confronted her with a gun in his hand, and calmly talked with her on a sofa before "sho[oting] her in the back . . . twice, until she was dead" when she tried to escape. The trial

court concluded that "[i]t just doesn't get any more serious than this . . . a premeditated, planned out, executed homicide of two innocent individuals." As a result, the trial court found that the first *Wilkerson* factor had been properly established. The defendant does not appear to challenge the correctness of this finding.

The record also establishes that the trial court considered whether consecutive life sentences were necessary to protect the public, and found that they were. The defendant challenges this finding as erroneous. The defendant argues that if concurrent life sentences had been imposed instead, the defendant would not have been eligible for parole for fifty-one years, at which time he would have been seventy-three years old. The defendant argues that the State made no showing before the trial court that the defendant would be dangerous to anyone at that age. Moreover, the defendant urges that, even at that age, the parole board would have the authority to evaluate any potential danger the defendant might pose to society before authorizing his release. The trial court conceded at the defendant's sentencing hearing that it had no then-present ability to predict "what [the defendant is] going to be like at age 73," and the State has not disputed that conclusion on appeal. Both the court below and the State justify the consecutive sentences as necessary to protect the public from the danger posed by the defendant as he stood at the time of his sentencing.

Consequently, the key question before this court is: at what stage in time should a defendant's dangerousness be evaluated for purposes of determining whether consecutive sentences are necessary in order to protect the public from the defendant's potential to commit future criminal acts as required by *Wilkerson* – the time of the defendant's sentencing, or the time of the defendant's projected earliest possible release date if concurrent sentences are imposed? Although the latter choice appears at first glance more tempting, our court has effectively adopted the former stance by virtue of consistently upholding against *Wilkerson* challenges a variety of sentences imposed consecutively to an extremely lengthy prison sentence – up to and including sentences of life in prison and life in prison without the possibility of parole. *See, e.g., State* v. *Eric Ricardo Middleton*, No. W2010-01427-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 833, **63-65 (Tenn. Crim. App. Nov. 14, 2011) (upholding a twenty-five-year sentence ordered to be served consecutive to a mandatory life sentence); *State v. Joshua Lee Brown*, No. M2010-00437-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 746, **48-57 (Tenn. Crim. App. Sept. 28, 2011) (upholding a twenty-year sentence ordered to be served consecutive to a sentence of life without the possibility of parole); *State v. Randy Parham*, No. W2009-02576-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 1049 (Tenn. Crim. App. Dec. 10, 2010) (upholding a sentence of six years ordered to be served consecutive to a sentence of fifteen years to be served at 100 percent, both of which were ordered to be served consecutive to a sentence of twenty-five years to be served at 100 percent).

Numerous practical considerations support the reasoned judgment of this court. First, the date on which a defendant will become eligible for release if concurrent sentences are imposed cannot be ascertained with any certainty at the time of sentencing. While calculations can be done in advance and a potential release eligibility date can be predicted, that date is by no means certain. Federal law, consent decrees, prison overcrowding, legislative largess, and numerous other factors could all intervene over the years to unexpectedly change and advance that predicted date. Moreover, whenever a defendant is convicted of multiple crimes, the possibility exists that some of those convictions may be reversed on appeal while others remain intact. With respect to concurrent sentences of dramatically differing lengths, the reversal of the lengthiest sentence could have a powerful impact on a defendant's earliest release eligibility date and, consequently, a profound effect on whether the defendant would still be dangerous at the time of his earliest possible release. Trial courts are in no position to predict and consider all of these various contingencies at the time they are imposing a sentence. In light of the primary rationale underlying the *Wilkerson* rule – that a trial court's duty to "make the[] specific findings before imposing a consecutive sentence on a 'dangerous offender' arises from the fact that of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply," *Lane*, 3 S.W.3d at 461- we cannot logically require trial courts to prognosticate as to a defendant's potential level of dangerousness at some unspecified point in the future, thereby rendering the *Wilkerson* findings even more subjective and harder to apply than the broad subjective offender category they were intended to clarify.

Moreover, any rule that would require the State to demonstrate a defendant's dangerousness at some specified or unspecified point in the future would impose a difficult, if not insurmountable, burden on the State because any such inquiry is inherently speculative. Worse still, the level of speculativeness involved would necessarily increase in proportion to the length of the concurrent sentences, which are themselves dictated by the seriousness of the underlying crimes. Consequently, adopting the defendant's position would lead to the perverse result that the more heinous a defendant's crimes (and therefore the longer until his earliest projected parole eligibility date if sentenced concurrently), the less likely it would be that the State could establish that the defendant would remain dangerous at that point in the future and thereby establish that the crimes merited consecutive sentencing.

In the specific context of premeditated murder cases, applying *Wilkerson* in the fashion urged by the defendant poses an additional danger. As the trial court correctly recognized, courts "would never be in a position of being able to impose consecutive sentences [in premeditated murder cases] because [the] argument [that the defendant will pose no danger to society after serving concurrent life sentences] would apply to everybody." It would be an unfortunate rule of law indeed that would permit, under the auspices of protecting society from "dangerous offenders," consecutive sentences to be imposed on

defendants who commit multiple counts of crimes like assault but effectively prohibit the imposition of consecutive sentences on defendants who commit multiple counts of premeditated murder. For a similar reason, the defendant's argument that the Board of Pardons and Parole can gauge a defendant's dangerousness after he serves the minimum required by his sentence also proves too much. If the parole board's review can be deemed a sufficient safeguard against a defendant's future dangerousness for *Wilkerson* purposes, then the second *Wilkerson* factor could rarely if ever be applied to any parole-eligible extended sentence.

For these and other practical reasons, we hold that trial courts should consider whether or not consecutive sentencing is "necessary to protect the public against further criminal conduct by the defendant," as required by *Wilkerson*, 905 S.W.2d at 939, by gauging the defendant's level of dangerousness as the defendant stands at the time of sentencing. In this case, the trial court concluded that "at age 22 [the defendant] is a dangerous offender" and that consecutive sentencing was necessary in order to protect the public from his potential to commit future criminal acts. The record amply supports this decision.

The trial court's decision to impose consecutive life sentences on this defendant comports with *Wilkerson* and the general principles of sentencing. The defendant's claim is therefore denied.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE